# EXHIBIT 2

AO 88B  (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Delaware

| | | |
|---|---|---|
| Palladian Partners, L.P. et al | ) | |
| *Plaintiff* | ) | C.A. No. _____ |
| v. | ) | |
| | ) | |
| . | ) | (If the action is pending in another district, state where: |
| *Defendant* | ) | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:   Dynamic Labs, Inc., c/o Cogency Global Inc., 850 New Burton Rd., Suite 201, Dover, Delaware 19904

☒ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

| Place:    Quinn Emanuel Urquhart & Sullivan, LLP | Date and Time: |
|---|---|
| 500 Delaware Avenue, Suite 220 | July 25, 2025 at 9:00 a.m. |
| Wilmington, Delaware 19801 | |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:         July 11, 2025

*CLERK OF COURT*

OR

_____                    _____
*Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* _____
Palladian Partners, L.P. et al. _____ , who issues or requests this subpoena, are:
Michael Barlow
Quinn Emanuel Urquhart & Sullivan, LLP
500 Delaware Avenue, Suite 220
Wilmington, Delaware 19801
Tel. +1 (302) 302-4030
E: michaelbarlow@quinnemanuel.com

AO 88B  (Rev.  06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

C.A. No _____

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____

I declare under penalty of perjury that this information is true.

Date: _____                 _____
                                                    *Server's signature*

                                                    _____
                                                    *Printed name and title*


                                                    _____
                                                    *Server's address*


Additional information regarding attempted service, etc:

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*

   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

     **(i)** At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

     **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*

   **(A)** *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

     **(i)** fails to allow a reasonable time to comply;

     **(ii)** requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

     **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

     **(iv)** subjects a person to undue burden.

   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

     **(i)** disclosing a trade secret or other confidential research, development, or commercial information;

     **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

     **(iii)** a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

     **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

     **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*

   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

     **(i)** expressly make the claim; and

     **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified;

and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

(e) Contempt. The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## <u>ATTACHMENT A TO SUBPOENA</u>

### <u>Definitions</u>

1.  **"API"** or Application Programming Interface means any set of protocols, routines, tools, or endpoints provided by or accessible through Your platform that allow third-party software or internal systems to programmatically interact with Your data, services, or infrastructure.  This includes, but is not limited to, endpoints used for:

    (a)  user authentication and session management;

    (b)  wallet creation, connection, and management operations;

    (c)  transaction initiation, signing, and broadcasting;

    (d)  querying Wallet Address data and account information;

    (e)  retrieving user metadata, authentication history, or session data;

    (f)  accessing analytics or scoring tools and risk assessment systems;

    (g)  performing account authentication and authorization; and

    (h)  any webhooks, callbacks, or event notifications sent by Dynamic Labs systems.

2.  **"API Records"** means logs, data, or metadata associated with API usage, including request/response logs, authentication tokens, rate limiting data, error logs, and usage analytics for the above API categories.

3.  **"Authentication Event"** means any record of a user establishing or attempting to establish identity or access to Dynamic Labs' Systems or authenticated Wallets.  This includes:

    (a)  traditional Web2 authentication (username/password, social login, biometrics or other identity verification methods);

    (b)  Web3-specific authentications, particularly:

        (i)  cryptographic message signing using wallet private keys or other cryptographic proof methods;

(ii)    wallet connection approvals to applications or Dynamic Labs services;

(iii)    transaction signing requests and responses processed through Dynamic Labs infrastructure;

(c)    multi-factor authentication events and associated verification methods;

(d)    device identifiers and device fingerprinting data associated with authentication attempts;

(e)    IP addresses and geolocation data associated with authentication events; and

(f)    authentication success/failure logs including timestamp data and any associated error codes or failure reasons;

(g)    SDK or API authentication events for embedded wallet implementations; and

(h)    session token generation, refresh, and expiration events.

(i)    account recovery of an embedded wallet

4.    **"Banking Records"** means all records, data, documents, or communications reflecting or relating to any financial transactions involving fiat currency or traditional financial institutions conducted by, on behalf of, or in connection with any user, User Account, or Wallet Address using or accessing Your services. This includes, without limitation:

(a)    Records of deposits, withdrawals, transfers, or settlements between cryptocurrency wallets and bank accounts (e.g., ACH, SWIFT, SEPA, wire transfers, credit/debit card transactions);

(b)    Transaction receipts, invoices, confirmations, or account statements reflecting fiat onramps (e.g., purchases of cryptocurrency using a credit card, debit card, or bank transfer) or offramps (e.g., conversions of cryptocurrency to fiat currency and withdrawal to a bank account), including through centralized exchanges;

(c)    Records of interactions with centralized exchanges (CEXs) or fiat/crypto conversion services used to facilitate asset purchases, liquidations, settlements, custody, or identity verification (e.g., Coinbase, Binance, Kraken, Moonpay, Sardine, Transak, Stripe, Wyre, or Plaid);

(d)    User-submitted or system-collected banking information, including account holder name, bank name, routing number, account number, credit card details, and any associated verification documentation;

(e)    Internal records tracking or auditing fiat-related activity connected to User Accounts, Wallet Addresses, or fiat-to-crypto conversion events;

(f)    Compliance, due diligence, or internal review records relating to fiat transactions, including anti-money laundering (AML), Know Your Customer (KYC), sanctions screening, fraud detection, or risk scoring; and

(g)    Correspondence, logs, or communications relating to the creation, verification, approval, or use of any fiat payment method, withdrawal channel, or third-party exchange account.

"**Banking Records**" includes such records regardless of whether Dynamic Labs acts as a direct custodian of fiat funds or relies on APIs, SDKs, white-labeled services, or embedded integrations with third-party institutions, custodians, or centralized exchanges to facilitate these transactions.

5.    "**Behavioral Scoring**" means any data-driven or algorithmic method used to analyze a user's activity, behavior, or usage patterns on Your platform to assign a quantitative or qualitative score, flag, or classification. Behavioral scoring may include assessments of transaction frequency, wallet interactions, account creation patterns, device usage, navigation paths, or any anomaly detection used for profiling, fraud prevention, marketing, or user engagement analysis.

6.    "**Blockchain**" means a distributed, decentralized digital ledger that records transactions across a network of computers.  For purposes of this request, "Blockchain" specifically includes:

(a)    the Solana blockchain, including its mainnet-beta, testnet, and devnet environments, with particular focus on slot numbers, block heights, transaction signatures, and program instruction execution;

(b)    any layer-1 or layer-2 blockchain networks where Dynamic Labs provides wallet infrastructure services;

(c)    any cross-chain bridges specifically serviced by Dynamic Labs infrastructure;

(d)     the specific ledger entries, transaction signatures, account state changes, and
        program interactions accessible through or logged by Dynamic Labs' systems; and

(e)     all blockchain transaction data that Dynamic Labs facilitates, authenticates, logs,
        or retains in connection with user interactions through its infrastructure.

7.     **"Cryptocurrency"** means any form of digital or virtual asset that uses cryptographic

protocols or blockchain-based technologies to record, secure, verify, or facilitate

transactions, whether or not such currency has legal tender status in any jurisdiction.

This includes, but is not limited to:

(a)     coins and tokens (including fungible and non-fungible tokens (NFTs)) that
        operate on decentralized or distributed ledger technologies (including but not
        limited to Bitcoin, Ethereum, Solana, and similar networks);

(b)     digital assets issued, traded or utilized to engage on decentralized platforms such
        as Decentralized Exchanges (DEXs);

(c)     stablecoins or algorithmic tokens that purport to maintain value parity with fiat
        currency or other assets; and

(d)     any derivative instruments, wrapped tokens, staking derivatives, or synthetic
        representations of digital or fiat assets transacted using blockchain infrastructure.

The term "Cryptocurrency" also includes any associated metadata, ledger entries, wallet

balances, or transaction records, whether stored on-chain or off-chain.

8.     **"Communications"** means any transmittal and/or receipt of information, whether such

was oral or written, and whether such was by chance, prearranged, formal or informal,

and specifically includes, but is not limited to, conversations in person, telephone

conversations, electronic mail (including instant messages and text messages), voicemail,

letters, memoranda, statements, media releases, magazine and newspaper articles, and

video and audio transmissions.

4

9.    **"Custom Metadata or Labels"** means any internal tags, classifications, annotations, or identifiers applied by Your Systems to a user's Wallet Address, User Account, or associated data. This includes, but is not limited to:

(a)    Labels or categories assigned to transactions, Wallet Addresses, or User Accounts for purposes of risk management, fraud prevention, or behavioral analysis.

(b)    Any notes or internal identifiers created by Your team for organizing or tracking user activity, wallets, or transactions.

(c)    Behavioral scoring or risk scoring associated with a Wallet Address or User Account.

(d)    Labels or identifiers used for categorizing users (e.g., verified, flagged, suspicious, etc.).

(e)    Any custom metadata attached to Wallet Addresses that was manually or automatically applied by Your platform or services.

10.    **"Data Retention"** and/or **"Deletion Activity"** means any actions or records reflecting the retention, archiving, deletion, or anonymization of any data associated with a user, User Account, or Wallet Address.  This includes, but is not limited to:

(a)    Logs or records indicating when and how data was retained, archived, or deleted.

(b)    Policies or procedures governing data retention and deletion practices, including retention periods.

(c)    Records of any automated or manual processes involved in data deletion.

(d)    Any communication or documentation related to user requests for deletion of personal data, account data, or transaction history.

(e)    Records of data anonymization or data purging, including the removal of user identifiers, transaction data, or wallet metadata.

11.    **"dApp" (Decentralized Application)** means any application or software that operates on a blockchain or distributed ledger network, typically through smart contracts, without reliance on a centralized server or administrator. For purposes this request, "dApp" includes, but is not limited to, platforms for decentralized finance (DeFi), gaming, NFT

marketplaces, staking services, or any other blockchain-based services with which users may interact directly or indirectly through Wallet Addresses, Web3 integrations, or APIs.

12.   **"Device Identifier"** means any data, string, code, or unique attribute used to distinguish, tag, recognize, or associate a specific physical or virtual device with a user or account. This includes, without limitation:

(a)      hardware identifiers (e.g., IMEI, MAC address, serial number);

(b)      software identifiers (e.g., advertising ID, IDFA, Android ID);

(c)      browser or device fingerprinting data (e.g., screen resolution, operating system, font libraries, plugins, timezone);

(d)      any unique identifier generated or assigned by Your systems to a device; and

(e)      third-party SDK or analytics tool identifiers (e.g., from Firebase, Segment, Mixpanel, or similar services).

"Device Identifier" includes both persistent and ephemeral identifiers, whether user-visible or system-generated, and whether collected explicitly or through passive telemetry.

13.   **"DEX" (Decentralized Exchange)** means any decentralized platform, protocol, or application that facilitates peer-to-peer cryptocurrency or digital asset trading without the involvement of a centralized intermediary. A DEX allows users to exchange tokens directly from Wallet Addresses via smart contracts, typically using liquidity pools or automated market maker (AMM) mechanisms.  For purposes of this request, "DEX" includes, but is not limited to, platforms such as Uniswap, SushiSwap, Curve, PancakeSwap, or any similar service enabling on-chain token swaps or liquidity provisioning.

14.   **"Documents"** is meant in the broadest possible sense and includes, but is not limited to, any writings and includes the following items, whether printed or recorded or reproduced

by any other mechanical process or written or produced by hand, including drafts: agreements; communications; correspondence; electronic mail; text messages; telegrams; memoranda; summaries, records or reports of telephone conversations, personal conversations, interviews, meetings, conferences, investigations or negotiations; opinions or reports of consultants; diaries; graphs; reports; notebooks; charts; plans; drawings; sketches; maps; photographs; film; brochures; pamphlets; advertisements; circulars; press releases; letters; faxes; any marginal comments appearing in any documents; tape recordings; electronic transmissions; computer printouts and all other writings. Documents shall not be limited in any way as to the form of storage (such as paper, microfiche, magnetic tape, magnetic disk, CD-ROM, DVD, optical disk, or other electronic-storage device).  A draft or non-identical copy of a document is a separate document within the meaning of this term.

15.    **"Draft"** means any earlier, preliminary, preparatory, or tentative version of all or part of a Document, whether or not such Draft was superseded by a later Draft and whether or not the terms of the Draft are the same as or different from the terms of the final Document.  Each and every Draft of a document is a separate document for purposes of these document requests.

16.    **"Dynamic Labs"**, **"Dynamic"**, **"You"**, or **"Yours"** means Dynamic Labs, Inc. and each and all of its current and former parents, owners, subsidiaries, affiliates, divisions, predecessors, successors, employees, managers, officers, directors, shareholders, partners, general partners, limited partners, members, agents, representatives, attorneys, accountants, consultants, independent contractors or any other Person acting, or purporting to act, with or on behalf of any of the foregoing.

17.    **"Fiat Onramp or Offramp Activity"** means any transactions or activities involving the conversion between cryptocurrency and fiat currency through Your platform.  This includes, but is not limited to:

(a)    Records of transactions where a user deposits fiat currency in exchange for cryptocurrency (fiat-to-crypto transactions);

(b)    Records of cryptocurrency withdrawals that are exchanged for fiat currency (crypto-to-fiat transactions);

(c)    Information regarding third-party fiat payment processors or onramp/offramp services integrated with Your platform (e.g., Moonpay, Transak, Wyre, etc.);

(d)    Logs showing attempts to deposit or withdraw fiat via ACH, bank transfers, credit card, or any other fiat funding or withdrawal methods; and

(e)    Transaction records reflecting any fees, limits, or conditions tied to fiat onramps or offramps.

18.    **"Geolocation"** means any data or metadata that identifies, approximates, or is capable of being used to determine the physical location of a device, user, session, or network access point. This includes, without limitation:

(a)    GPS coordinates;

(b)    IP address-based location data;

(c)    Wi-Fi access point data;

(d)    cell tower triangulation;

(e)    browser or device location services;

(f)    location information inferred from user behavior or activity patterns; and

(g)    any third-party geolocation service data integrated into or accessed by Your systems.

"Geolocation" shall include both real-time and historical location data, whether precise or approximate, and regardless of whether such data was actively collected with user consent or passively logged by systems, applications, or network infrastructure.

19.   **"Government"** refers to any governing body, including the United States of America,

the Republic of Argentina, INTERPOL, or any other federal government, state

governments, and local governments, and their related agencies, entities, and agents.

20.   **"Identify"** means

(a)   with respect to a Person, providing

(i)    their name,

(ii)   their job title (if a natural Person),

(iii)  their address and telephone number, and

(iv)   a general description of the information about which the Person has
       knowledge, as sought below; and

(b)   with respect to a Document, providing

(i)    its Bates number,

(ii)   its custodian,

(iii)  its date,

(iv)   its author(s), and

(v)    a general description.

21.   **"IP Records"** means any logs, data, metadata, or other records reflecting or relating to an

Internet Protocol (IP) address associated with any interaction by a user with Your

systems, platforms, applications, APIs, or infrastructure. This includes, without

limitation, records of IP addresses collected during:

(a)   account registration or login;

(b)   wallet access or usage events;

(c)   transaction initiation or approval;

(d)   communication with customer support or API endpoints; and

(e)    any device or session data reflecting geolocation, device fingerprinting, browser type, or timestamped access.

"IP Records" shall include, where available, any associated headers, cookies, session tokens, device IDs, or other data points that accompany or are linked to such IP address logs.

22.    **"Know-Your-Customer Records"** or **"KYC Records"** means any and all documentation, data, or information collected or maintained by You or on Your behalf to identify or verify the identity of users, whether collected voluntarily, for compliance purposes, or pursuant to legal, regulatory, or internal policy obligations.

This includes, without limitation:

(a)    full name, date of birth, physical address, email address, and phone number;

(b)    government-issued identification documents (e.g., driver's licenses, passports), and scans or images thereof;

(c)    biometric data (e.g., facial recognition data, fingerprint scans);

(d)    identity verification responses and authentication methods;

(e)    documents used for proof of address (e.g., utility bills, bank statements);

(f)    results of identity checks, sanctions screening, or adverse media screening;

(g)    IP address, device data, and location data used in connection with identity verification; and

(h)    all communications, records, notes, or files maintained in connection with the identity verification process.

"KYC Records" includes both data provided directly by users and any data obtained through third-party KYC or identity verification service providers.

23.    **"Media"** refers to all means of mass communication, including newspapers, journals, television, radio, and the Internet.

24.  **"Metadata"** means any data that provides information about other data, and includes, but is not limited to:

(a)  System Metadata: Information automatically recorded by a computer system or software when data is created, modified, accessed, transmitted, or deleted. Examples include:

    (i)  File creation and modification dates.

    (ii)  File size.

    (iii)  File format or extension.

    (iv)  User or device ID responsible for the action.

    (v)  Network path or storage location.

(b)  Application Metadata: Data embedded within or associated with files or records that describe how, when, and by whom a piece of data was created or modified. This may include:

    (i)  Author name.

    (ii)  Version history.

    (iii)  Document properties (e.g., title, subject, tags).

    (iv)  Edit or access timestamps.

(c)  Web and Session Metadata: Information automatically collected during user interactions with digital platforms or applications, including:

    (i)  IP addresses.

    (ii)  Browser type and version.

    (iii)  Device identifiers.

    (iv)  Session duration and timestamps.

    (v)  Geolocation data.

    (vi)  Referring URLs or dApps.

(d)  Blockchain Metadata: Information surrounding cryptocurrency transactions or smart contract interactions that is not necessarily on-chain but is logged or recorded by intermediary platforms, such as:

      (i)      Transaction tags or internal notes.

      (ii)     Off-chain identifiers associated with a wallet or transaction.

      (iii)    User behavior data or risk scores.

      (iv)    Tags or labels applied to wallet addresses or assets.

Metadata shall include both visible and hidden data, and may be stored separately from or embedded within the underlying file or database record.

25.    **"Meteora"** means Meteora.ag, Meteora, Meteora DAO, any employees associated with Meteora and any other person/entity associated with the creation, maintenance, operation, governance or in any way involved with Meteora.ag, a decentralized platform offering dynamic liquidity pools, amongst other services.

26.    **"Person"** or **"Persons"** mean natural persons, proprietorships, corporations, companies, partnerships, trusts, joint ventures, groups, associations, organizations, and all other forms of organization or entity, including governmental bodies and agencies and all of its directors, officers, employees, representatives, or agents.

27.    **"Program"** means any executable code deployed on a blockchain that processes instructions and manages state. "Program" includes, but is not limited to:

    (a)     Any program that governs token operations, swaps, staking, lending, or asset transfers;

    (b)     Any program instruction execution logs associated with Wallet Addresses or User Accounts;

    (c)     Programs created, deployed, interacted with, or accessed via Your platform or services;

    (d)     Any related program metadata, deployment records, instruction logs, or account state changes; and

    (e)     Any program address or program-derived address used to access, identify, or reference the program.

28.    **"Records"** means any and all written, typed, printed, recorded, graphic, photographic, digital, electronic, or machine-readable materials of any kind, whether stored on paper, film, tape, disk, server, cloud-based platform, database, or any other medium. For purposes of this request, "Records" includes, but is not limited to:

(a)    Emails, messages, chat logs, notifications, or other communications;

(b)    Files, documents, spreadsheets, presentations, notes, or memoranda;

(c)    Data logs, audit trails, metadata, or transaction histories;

(d)    User-generated content, system-generated data, or structured database entries;

(e)    Internal reports, analyses, charts, graphs, or dashboards;

(f)    Photographs, screenshots, recordings, or visual media; and

(g)    Any drafts, backups, archives, or deleted versions of the foregoing.

"Records" includes all versions, whether original, duplicate, altered, or redacted, and regardless of whether the information is held actively, archived, temporarily stored, or deleted but recoverable.

29.    **"Relating"** or **"related"** when used with respect to any subject, means and includes: analyzing, consisting, constituting, containing, compromising, commenting upon, connected with, concerning, contradicting, dealing with, describing, embodying, establishing, evidencing, identifying, listing, memorializing, pertaining to, purporting, referring to, relating to, regarding, recording, responding to, reflecting, representing, stating, substantiating, showing, supporting, or with respect to, whether in whole or in part of having any logical or factual connection whatsoever with that subject, regardless of whether the factual connection is favorable or adverse to You.

30.    **"Risk Scoring"** means any score, flag, or label applied to a user, Wallet Address, or User Account based on internal or external assessments of financial risk, fraud risk,

compliance risk, or security threat. This may include automated or manual evaluations based on KYC results, transaction histories, geolocation data, device patterns, IP usage, interaction with high-risk wallets or services, or known indicators of suspicious activity (e.g., links to mixers or sanctioned entities).

31.    **"Session Data"** means any record, log, or metadata reflecting a discrete period of user interaction with Your Systems. This includes, without limitation:

(a)    timestamps of session start and end;

(b)    associated IP addresses, geolocation, and Device Identifiers;

(c)    authentication methods used during the session;

(d)    wallet addresses or accounts accessed;

(e)    user agent data (e.g., browser, OS, version);

(f)    API requests or actions taken during the session; and

(g)    session tokens, cookies, or access credentials issued, used, or invalidated.

"Session Data" includes data from both authenticated and unauthenticated sessions, and encompasses real-time and historical records, regardless of the session's duration or completeness.

32.    **"Smart Contract"** means any self-executing code, script, or program deployed on a blockchain or distributed ledger that automatically performs, enforces, or facilitates the execution of terms and conditions without the need for intermediary oversight. On Solana, this primarily refers to Programs as defined above. For purposes of this request, "Smart Contract" includes, but is not limited to:

(a)    Any blockchain-based protocol that governs transactions, token swaps, staking, lending, or asset transfers;

(b)    Programs and smart contracts on blockchain networks that interact with Wallet Addresses, User Accounts, or digital assets through automated logic or rules;

(c) Smart contracts and Programs created, deployed, interacted with, or accessed via Your Systems;

(d) Any related metadata, source code, deployment records, or transaction logs associated with smart contract or Program execution; and

(e) Any contract address or program address used to access, identify, or reference the Smart Contract or Program or blockchain identifier used to access, identify, or reference the smart contract.

"Smart Contract" includes both externally accessible smart contracts and contracts

deployed or maintained internally or on behalf of users.

33. **"Systems"** means the full technical infrastructure, platforms, tools, software, interfaces,

and services operated, maintained, or integrated by Dynamic Labs, Inc. or any of its

agents, contractors, or affiliates, whether proprietary or third-party, that enable or support

any interaction with cryptocurrencies, digital assets, blockchains, or decentralized

applications (dApps). This includes, without limitation:

(a) Web or mobile applications, administrative portals, dashboards, or control panels used by end users, clients, or Dynamic Labs personnel;

(b) APIs, SDKs, CLIs, webhooks, or other developer-facing interfaces through which users or applications interact with Dynamic Labs services, including for wallet management, authentication, transaction signing, or analytics;

(c) Backend infrastructure, cloud environments, or server-side codebases that perform transaction routing, blockchain indexing, user session management, data storage, key management, or telemetry capture;

(d) Wallet services, including embedded wallet infrastructure, MPC key management, smart contract wallets, custodial or non-custodial wallet modules, and associated recovery or authentication flows;

(e) Blockchain node infrastructure, RPC gateways, blockchain indexers, bridge monitors, oracles, or any systems used to interact with, submit transactions to, or receive data from supported blockchain networks (including but not limited to Ethereum, Solana, BNB Chain, Avalanche, Arbitrum, Optimism, Polygon, and Bitcoin);

(f) Systems or services that log, store, analyze, or transmit data associated with user activity, including device fingerprinting, IP geolocation, behavioral or risk scoring, authentication history, or transaction metadata;

(g)     Any internal databases, message queues, logging services, compliance or fraud detection systems, monitoring tools, or analytics platforms used to capture, retain, or process blockchain-related activity;

(h)     Any third-party services, platforms, or providers (e.g., Plaid, Moonpay, Transak, Segment, Firebase, AWS, GCP, etc.) integrated into Dynamic Labs' operations for identity verification, fiat onramp/offramp, user engagement, or infrastructure support.

"Systems" includes all environments and components—production, staging, test, backup, or archive—and encompasses functionality provided directly by Dynamic Labs or on its behalf through vendors, subcontractors, or integration partners.

34.    **"Third-Party App Usage"** means any interaction between a Wallet Address and third-party decentralized applications (dApps), services, or platforms that access or utilize Your platform or wallet infrastructure. This includes, but is not limited to:

(a)     Records of Wallet Addresses interacting with dApps, smart contracts, or external platforms integrated with or accessed through Your wallet.

(b)     Logs of dApp access times, transaction activities, or wallet authorization events involving third-party applications.

(c)     Data showing any third-party integrations with Your wallet, including any partnerships with payment processors, identity verification services, or blockchain protocols.

(d)     Logs of permissions granted to third-party services, such as data access permissions or wallet authorization requests.

35.    **"Transaction Hashes"** means the unique cryptographic identifiers or hash strings generated for each cryptocurrency transaction recorded on the blockchain. This includes:

(a)     Each transaction hash associated with a transfer, purchase, sale, smart contract execution, or other on-chain event involving a Wallet Address;

(b)     The name or identifier of the blockchain network (e.g., Ethereum, Solana, BNB Chain, Avalanche, etc.) on which the transaction occurred;

(c)     Any internal records, logs, or mappings maintained by You that link transaction hashes to specific Wallet Addresses, User Accounts, sessions, or API requests;

    (d)    Metadata associated with each transaction hash, including (where available) block number or height, confirmation status, timestamp, sender and recipient addresses, value transferred, gas/fee data, and smart contract method (if applicable);

    (e)    Any URLs, explorer links, or system-generated references that provide proof or verification of transaction execution on the relevant blockchain.

36.    **"Transaction Records"** means all records created, maintained, or logged by Dynamic Labs relating to blockchain transactions that were initiated, authenticated, signed, broadcast, or monitored through Dynamic Labs' infrastructure, APIs, or services, including:

    (a)    transaction signatures and/or transaction hashes, including both successful and failed transactions;

    (b)    Transaction instructions, contract calls, or protocol-specific execution data processed through Dynamic Labs systems (e.g., smart contract calls, method selectors, calldata, or cross-chain messaging activity);

    (c)    Block identifiers and confirmation metadata, including block heights, timestamps, or equivalents across supported blockchain networks (e.g., Ethereum, Solana, Avalanche, BNB Chain, Arbitrum, Optimism, or any other layer-1 or layer-2);

    (d)    Transaction status records (e.g., success, failure, revert reasons, error codes) as captured by Dynamic Labs systems;

    (e)    Fee-related data, including gas usage, compute units, prioritization fees, or transaction cost calculations as reported or derived from the originating network;

    (f)    Any internal transaction identifiers or tags used by Dynamic Labs to associate a transaction with a user, wallet, session, API request, or other internal object;

    (g)    any blockchain-based settlement event resulting from a fiat onramp or off-ramp, centralized exchange interaction, or decentralized protocol execution."

    (h)    Any logs, metadata, or monitoring artifacts maintained by Dynamic Labs for compliance, risk analysis, fraud detection, or anomaly tracking related to blockchain transactions processed through its infrastructure.

37.    **"User Account"** means any account or profile created or maintained on Your platform by an individual, entity, or automated process, which is used to access, create, manage, or interact with Wallet Addresses or services. A User Account may be identified by an

email address, phone number, social media login, cryptographic credential, third-party authentication method, or any unique identifier assigned by You or used by the user to access Your services.

38.  **"Wallet"** means any software or interface that allows users to generate, store, manage, or control cryptographic keys for accessing and transacting digital assets on blockchain networks. For purposes of this request, "Wallet" specifically refers to:

(a)  custodial wallets where Dynamic Labs maintains possession, control, or backup access to private keys or seed phrases;

(b)  non-custodial wallets where Dynamic Labs provides interface, authentication, or SDK services but users maintain exclusive control of private keys;

(c)  embedded wallets integrated into applications powered by Dynamic Labs technology or infrastructure including sandbox and live mode;

(d)  wallet-as-a-service infrastructure offered by Dynamic Labs to third parties, including but not limited to Meteora, Solana, or other clients;

(e)  multi-party computation (MPC) wallets, smart contract wallets, or other advanced wallet infrastructure provided by Dynamic Labs;

(f)  any seed phrases, private keys, or signing mechanisms that Dynamic Labs has any level of access to or involvement in managing; and

(g)  any authentication systems, recovery mechanisms, or key management solutions provided by Dynamic Labs.

39.  **"Wallet Addresses"** means any unique alphanumeric identifiers or cryptographic public key addresses used to send, receive, store, or interact with cryptocurrencies or digital assets on a blockchain. For purposes of this request, "Wallet Addresses" includes:

(a)  Any address used for transacting on public or private blockchain networks (e.g., Ethereum, Bitcoin, Solana, etc.);

(b)  Any externally owned addresses (EOAs) or contract addresses;

(c)  Any Wallet Address created, held, or managed through Your platform, services, or infrastructure;

18

(d)     Any address associated with a User Account, authentication event, device, or session on Your systems; and

(e)     Any address internally tagged, labeled, or linked by Your systems to identifiable users, devices, IP addresses, or metadata.

"Wallet Addresses" includes both active and inactive addresses, whether currently in use or previously associated with the platform or the subject of prior transactions.

**Instructions**

1.  In responding to this Subpoena, You are required to produce all responsive documents that are in Your possession, custody, or control or in the possession, custody, or control of Your agents, employees, or other representatives.  A document shall be deemed to be within Your control if You have the right to secure the document or a copy of the document from another person having possession or custody of the document.

2.  A reference to an organization or other legal entity (whether formed as a corporation, trust, partnership, or otherwise) means that entity and each and all of its: (a) predecessors, successors, subsidiaries, divisions, partnerships, limited partners, related parties, joint ventures, or affiliates; (b) present and former officers, employees, agents, representatives, trustees, directors, or its board of directors (either generally or committees thereof); (c) its attorneys, accountants, agents, representatives, and advisors (including investment bankers and public relations or other media consultants); (d) any professional employed or retained by that entity; and (e) all other Persons acting or purporting to act on its behalf.

3.  A reference to a natural person includes that person and each and all of his or her: (a) employees, agents, or representatives; (b) attorneys, accountants, agents, representatives, and advisors (including investment bankers and public relations or other media consultants); (c) any professional employed or retained by him or her; and (d) all other Persons acting or purporting to act on his or her behalf.

4.  Whenever used herein: (a) the singular shall be deemed to include the plural, and the plural shall be deemed to include the singular; (b) the term "including" shall be deemed to mean "including, but not limited to," and shall not be construed to limit the scope of any definition or Interrogatory herein; (c) the masculine shall be deemed to include the

feminine, and the feminine shall be deemed to include the masculine; (d) the disjunctive

("or") shall be deemed to include the conjunctive ("and"), and the conjunctive ("and")

shall be deemed to include the disjunctive ("or"); and (e) each of the functional words

"any," "each," "every," and "all" shall be deemed to include each of the others.

5. The requests shall be deemed to be continuing so as to require supplemental productions

as You obtain additional documents between the time of the initial production hereunder

and the time of trial in these actions.

6. Each requested document shall be produced in its entirety, without abbreviation or

redaction, and shall include all attachments, appendices, exhibits, lists, schedules or other

documents at any time affixed thereto.  If a document responsive to any request cannot be

produced in full, it shall be produced to the extent possible with an explanation stating

why production of the remainder is not possible.

7. You must produce responsive documents as they have been kept in the usual course of

business or shall organize or label them to correspond to the enumerated requests of this

Subpoena.  If, after exercising due diligence to secure them, You cannot provide some or

any of the requested documents, so state and provide all documents to the extent possible,

specifying the reason for Your inability to produce the remainder of the documents, and

stating whatever information or knowledge You have concerning each document not

produced.

8. If any document is withheld under any claim of privilege, including without limitation,

attorney-client privilege and attorney work product, You should provide the following

information with respect to such document: (a) the date of the document; (b) the name of

its author(s) or preparer(s); (c) the name of each person who was sent or furnished with

21

the document or a copy thereof; (d) the title or description of the document sufficient to identify it without revealing the information for which privilege is claimed; (e) the claim of privilege under which it is withheld; and (f) a description of the subject matter of the document in sufficient detail to support Your contention that the document is privileged.

9.      If any requested document or other document potentially relevant to this action is subject to destruction under any document retention or destruction program, the document(s) should be exempted from any scheduled destruction and should not be destroyed until the conclusion of this action or unless otherwise permitted by the Court.

10.     If an objection is made to any request, state Your objection and the ground or grounds with particularity in Your written response.  If an objection is made only to part of the request, identify that part in Your written response and state Your objection and the ground(s) therefore.

11.     Terms not specifically defined shall be given their ordinary meanings as You understand them to be used in the trade or pursuant to ordinary usage.

12.     When producing documents and records in response to these requests, You should produce data as it exists and is correlated within Your systems. If Your systems do not maintain linkages between certain data points (e.g., between specific wallet addresses and user accounts, or between API calls and individual transactions), You are not required to create such linkages for purposes of this production, but should clearly indicate the limitations of available correlations in Your response.

13.     If a Wallet Address or Wallet Identifier listed in Appendix A or otherwise referenced in this Subpoena appears only in partial form (e.g., truncated, redacted, or with missing characters), You are instructed to perform a reasonable search using available tools, logs,

or internal identifiers to identify any complete Wallet Addresses or Wallet Identifiers in

Your possession, custody, or control that match or correspond to the partial identifier.

This includes, without limitation:

- Searching logs, databases, authentication records, or metadata fields for Wallet Addresses that begin with, end with, or otherwise match the partial identifier;

- Using any tagging, mapping, or indexing systems maintained by You to identify full Wallet Addresses linked to the partial value;

- Reviewing any historical records or internal references that may preserve the full Wallet Address or a record of its truncation, redaction, or abbreviation.

Upon identification of any such matching Wallet Address or Wallet Identifier, You shall

treat it as fully within the scope of the Requests and produce responsive Records

accordingly.

14.    Your response should, where applicable, distinguish between data available for custodial

wallet services (where You maintain access to private keys or seed phrases) versus non-

custodial wallet services (where You provide interface or authentication services only).

The scope and granularity of available data may differ significantly between these service

types.

## REQUESTS

**REQUEST NO. 1:**

All Documents and Communications concerning Meteora and Dynamic Labs. The responses should include, but are not limited to, name(s), personally identifiable information, account numbers, email addresses, phone numbers, Internet Protocol (IP) addresses, account access dates and times, payment information, billing addresses, and other information related to the identification of individuals using this service. The response should also include the above information for any domains or accounts linked to this request by IP address, phone number, name, email address, or any other identifier shared or in common.

**REQUEST NO. 2:**

All information related to Meteora's developer account with Dynamic Labs. This would include a list of all users, access rights, administration rights, geo-location data, IP addresses, e-mail addresses and any other information captured or accessible by Dynamic Labs. In addition, the response should include the specifications of the configuration of the Meteora Developer Dashboard outlining a full history of what user information is collected, a change log outlining any changes made over time and any applicable metrics available to Dynamic Labs. This response should also include, but is not limited to, software source code, hardware schematics, source code repositories (e.g., Git, Subversion, CVS, etc.), technical documentation, architecture diagrams, protocol specifications, change logs, roadmaps, milestones, or other project planning documentation, and change management or other ticketing system records (e.g., Jira, Asana, etc.).

**REQUEST NO. 3:**

All internal risk assessment, due diligence, monitoring logs, or unusual activity reports generated by Dynamic Labs' systems in relation to the Meteora account(s), including but not limited to: (a) vendor assessments (b) due diligence and reports relating to Meteora and/or key

contacts (e.g. Ben Chow); (c) ongoing reviews such as audits or monitoring (d) any other information or insights related to Meteora identified through Your infrastructure or monitoring systems.

**REQUEST NO. 4:**

All records of integration, partnership, or service provision between Dynamic Labs and Meteora, including but not limited to: (a) API integration logs and authentication records between Dynamic Labs and Meteora systems; (b) any wallet infrastructure services provided to Meteora for the $LIBRA token launch; (c) configuration or setup records for Meteora-related wallet functionality; (d) any technical documentation or communications regarding Dynamic Labs services provided to support Meteora's operations; and (e) any metadata or internal records linking Meteora's use of Dynamic Labs infrastructure to the $LIBRA token deployment.

**REQUEST NO. 5:**

All Documents or Records related to API Records; Banking Records; Behavioral Scoring; Custom Metadata or Labels; associated dApps or DEXs; Data Retention or Deletion Activity Records; Device Identifier Records; Fiat Onramp or Offramp Activity; Geolocation Records; KYC Documents; Risk Scoring; Third-Party App Usage; User Accounts; Wallets or Wallet Addresses associated with the Addresses listed in Appendix A.

**REQUEST NO. 6:**

All Communications sent to or from the User Accounts, Wallets, or Wallet Addresses associated with the Addresses listed in Appendix A for the time period January 1, 2025 to the date of production.

**REQUEST NO. 7:**

All Authentication Events, IP Records, Transaction Records or Transaction Hashes processed through or logged by Your infrastructure and associated with the Addresses listed in Appendix A for the time period January 1, 2025 to the date of production.

**REQUEST NO. 8:**

All Documents or Records related to API Records; Banking Records; Behavioral Scoring; Custom Metadata or Labels; associated dApps or DEXs; Data Retention or Deletion Activity Records; Device Identifier Records; Fiat Onramp or Offramp Activity; Geolocation Records; KYC Documents; Risk Scoring; Third-Party App Usage; User Accounts; Wallets or Wallet Addresses associated with the Individuals listed in Appendix B.

**REQUEST NO. 9:**

All Communications sent to or from the User Accounts, Wallets, or Wallet Addresses associated with the Individuals listed in Appendix B for the time period January 1, 2025 to the date of production.

**REQUEST NO. 10:**

All Authentication Events, IP Records, Transaction Records or Transaction Hashes processed through or logged by Your infrastructure and/or associated with the Individuals listed in Appendix B for the time period January 1, 2025 to the date of production.

**REQUEST NO. 11:**

All account creation logs, onboarding records, and authentication setups associated with the $LIBRA token deployment, including but not limited to timestamps, IP addresses, and device identifiers associated with the initial wallet configuration used to deploy the $LIBRA token, for the time period January 1, 2025 to the date of production.

**REQUEST NO. 12:**

All records of interaction between Dynamic Labs' infrastructure and any account associated with the $LIBRA token, including but not limited to: (a) Program deployment records; (b) Program instruction execution logs processed through Your infrastructure; (c) account creation and modification records logged by Your systems; (d) Program authority changes recorded by Your infrastructure; and (e) any admin or privilege level interactions with the token Program facilitated through Your services.

**REQUEST NO. 13:**

All internal risk assessment, monitoring logs, or unusual activity reports generated by Dynamic Labs' systems in relation to the $LIBRA token, including but not limited to: (a) transaction volume anomaly detection triggered by Your systems; (b) unusually large withdrawals or conversions flagged by Your monitoring tools; (c) significant price movement alerts generated by Your systems; and (d) any internal communications regarding potential market manipulation, rug pulls, or other suspicious activities related to the $LIBRA token identified through Your infrastructure or monitoring systems.

**REQUEST NO. 14:**

Deposition pursuant to Federal Rule of Civil Procedure 30(b)(6) from one or more designated corporate representatives of Dynamic Labs, Inc. who are most knowledgeable about the responsive documents and the issues related thereto.

**REQUEST NO. 15:**

Deposition of a representative of Dynamic Labs, Inc. selected by Petitioners based on their review of the responsive documents to the extent that Petitioners deem that the deposition of the Federal Rule of Civil Procedure 30(b)(6) designated corporate representatives of Dynamic Labs, Inc. does not resolve all of Petitioners' discovery queries.

**APPENDIX A**

| Addresses |
|---|
| jwudCiJ5QUUmfxPXN41jaqYKnSc3UmKo5RoRGkZzomN |
| BXoCWWijZiVQFXNRqcZAiHQroYkaUnjkRznnZrt9gj42 |
| 8NScYncjpY1 mKrbxV JFFdVqNPEocyXTnQqy9GW1 hg4j3 |
| 5fnahDWBtUB8QBTXWH m2QzfAoAVHToxvMf38i3a 7 okGe |
| P5tb4T6SBVQaM3BAoGfpVudLtTdecqjsh4KV9ESAhKg |
| DefcyKc4yAjRsCLZjdxWuSUzVohXtLna9g22y3pBCm2z |
| 0xcEAeFb5BEC983Fd10e324d7e6F5457507BA006e2 |
| EFrg9SXbnCfuVqJPJf2hKKY3CITPLHvipEpgrHjBkb4L |
| 5Wsjee6FgZQtxjUBedfNq9ZbV6RN7wgb4N422LyV3ZEr |
| FdWhTThthSN7mbcmBgh 18dzogi1 dXqQqBb6BnnzZEJJn |
| Gj9esbWVNJyy55SDJzYudMAznewqmW3Xb6GpUakcCNwT |
| 3apupKwTisjy4Wx1zVndXVegmxtR9majPEgHatBRZ1 LF |
| 61yKS9bjxWdqNgAHt439DfoNfwK3uKPAJGWAsFkC5M4C |
| B9KTwxhc9e6qrjw5nfmhgcN38oKFTBtnef8AwaTPVQ6q |
| FTjLYkNARZHnqekpKj5mHzbJx7EqW1fSr15Ec4oijBUQ |
| CpxV2iKkA8DT8d2dWMLanF6PAJVvTp1qJXEN5QmqsRPS |
| 4za6Cf |
| 0y9tS9 |
| 41sz23 |
| 662aG3 |
| F6GpYe |
| 9wk1Vr |
| 0x3516 (Arbitrum) |
| qW6gMV |
| 61aUyPe |
| 6MsuHd |

## APPENDIX B

1.    Hayden Mark Davis
      DOB: XX-XX-1996
      Irving, TX 75309

2.    Gideon Bradley Davis
      DOB: XX-XX-1999
      Irving, TX 75309 or
      Bellevue, WA 98004

3.    Charles Thomas Davis
      DOB: XX-XX-1970
      Irving, TX 75309